UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHRISTOPHER L. PROSSER,                    )
                                           )
          Plaintiff,                       )
                                           )
     vs.                                   )          Case No. 4:09CV2117 JAR
                                           )
GOVINDARAJULU NAGALDINNE, et al.,          )
                                           )
          Defendants.                      )

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Govindarajulu Nagaldinne, MD's Motion to Exclude the Testimony of Plaintiff's Expert Dr. Joel Nitzkin (ECF No. 199), Defendant Govindarajulu Nagaldinne, MD's Motion for Summary Judgment (ECF No. 200), Defendants George Lombardi, Melody Griffin, and Gale Bailey's Motion for Summary Judgment (ECF No. 203), Plaintiff's Motion to Exclude Report and Opinions of Dr. Richard Lehman (ECF No. 205), Defendants Corizon, Inc. f/k/a Correctional Medical Services, Inc., Dr. Michael Sands, Dr. Elizabeth Conley, Dr. Cleveland Rayford, Dr. Beverly Morrison, Dr. Laurain Hendricks, and Lois Cella's Motion for Summary Judgment (ECF No. 208), and Defendants' Daubert Motion to Exclude Plaintiff's Expert Dr. Joel Nitzkin (ECF No. 212). These motions are fully briefed and ready for disposition.

## BACKGROUND

The medical history and records in this case are extensive. In 1987, Plaintiff fell from a three story building and landed on his back. (ECF No. 204, p. 7). On May 24, 1988, Plaintiff had an MRI which revealed that he had a central disc herniation at L4-L5 and S1. (Id.). When Plaintiff entered the Missouri Department of Corrections (MDOC) in 1992, he complained of back pain and two herniated discs. (Id.).

On January 11, 1997, Plaintiff was stabbed multiple times, including in his right ankle. (ECF No. 204, p. 7). Thereafter, Plaintiff complained of pain radiating from a stab wound. (ECF No. 204, p. 8).

On June 16, 1997, Plaintiff experienced an episode where he was unable to dorsiflex his right foot actively, which is indicative of drop foot. (Id.). Foot drop is a condition where the nerves that give strength to the muscles that allow a person to lift his foot become weak and the person cannot lift or dorsiflex his foot or ankle. (Plaintiff's Statement of Additional Facts ("PSAF"), ECF No. 220-1, ¶10); see also http://www.webmd.com/a-to-z-guides/foot-drop-causes-symptoms-treatments, visited on December 13, 2012. Foot drop can result in difficulty walking because the foot "slaps" the ground due to an inability to lift the foot. (PSAF, ¶11). Foot drop can vary in degree from weakness to complete foot drop. (PSAF, ¶12).

On May 23, 2002, Plaintiff was diagnosed with rheumatoid arthritis ("RA"). (ECF No. 204, p. 8). Plaintiff was referred to Dr. Helen Rice, a RA specialist in late 2004 and early 2005. (Id.). Dr. Rice stated that Plaintiff's discomfort in his right side may be related to his history of RA. (Id.).

In early August 2006, Plaintiff was jogging on a path at the Farmington Correctional Center ("FCC"), and he stepped into a hole. (PSAF, ¶3). Plaintiff claims that he had no difficulty walking prior to his injury in August 2006. (PSAF, ¶4). Plaintiff experienced severe pain and lost the use of his right foot. (PSAF, ¶5). Another inmate, Christopher Arnold, told Plaintiff that he had "foot drop" and neurological issues. (PSAF, ¶6). On August 2, 2006, Plaintiff filled out a Medical Services Request ("MSR"), which stated that he was suffering from foot drop on the right side and other neurological problems. (PSAF, ¶8).

Plaintiff was evaluated by a nurse, Christine Wenneker, on August 2, 2006, after he was told he could not see a physician. (PSAF, ¶¶15-16; ECF No. 201, ¶¶7-8). There is a dispute regarding what occurred at that visit. Plaintiff contends that he reported pain and told the nurse he could not

move his foot and he was unable to move his foot up, down, or side to side. (PSAF, ¶¶16-17). Plaintiff was referred to a doctor. (ECF No. 201, ¶13).

On August 7, 2006, Plaintiff saw a nurse, Lori Wilson, who indicated that Plaintiff had a prior history of herniated discs and was unable to flex/extend his right foot. (ECF No. 201, ¶15). Plaintiff was scheduled to see a physician. (ECF No. 201, ¶16).

On August 11, 2006, Plaintiff saw Dr. Nagaldinne. (ECF No. 201, ¶17). There is also a dispute regarding what occurred at that visit. Plaintiff claims that he required help to walk to the medical unit. (PSAF, ¶¶19-20). Plaintiff described pain running down his leg and loss of the use of his foot. (PSAF, ¶¶21-22). Plaintiff asserts that he also told Dr. Nagaldinne that he had foot drop and a spinal injury, and that it was a surgical emergency. (PSAF, ¶22). Plaintiff claims that Dr. Nagaldinne failed to document his entire complaint and seemed angry when Plaintiff used medical terminology with him. (PSAF, ¶¶23, 26). Plaintiff asserts that Dr. Nagaldinne told him that the surgery he requested was too expensive and would not be approved, and that Plaintiff would just have to try walking on it. (PSAF, ¶27). Plaintiff claims that Dr. Nagaldinne looked at Plaintiff's foot but did not touch Plaintiff or perform any physical exam. (PSAF, ¶29). Plaintiff states that his visit with Dr. Nagaldinne lasted five minutes or less. (PSAF, ¶29). Dr. Nagaldinne admitted that foot drop is a serious condition and that delay in treating foot drop can result in permanent injury. (PSAF, ¶13). Likewise, Dr. Nagaldinne stated that foot drop is consistent with a worsening of a herniated disc and that the onset of foot drop in a patient with a herniated disc is a significant medical development. (PSAF, ¶14).

In contrast, Dr. Nagaldinne reports that on August 11, 2006, he observed Plaintiff walk into the examination and watched his gait to see if there were any neurological deficits, but he did not note any. (ECF No. 201, ¶¶46-58). Dr. Nagaldinne claims that he performed an examination of Plaintiff's spine, which was normal, and Plaintiff's range of motion and straight-leg-raising ("SLR")

test was normal.  (ECF No. 201, ¶20).  Plaintiff's sensory and motor systems were also normal.  (ECF No. 201, ¶20).  Dr. Nagaldinne examined Plaintiff's right foot and Achilles tendon, which were both normal.  (ECF No. 201, ¶21).  Dr. Nagaldinne determined that Plaintiff did not have foot drop because he was able to walk and get onto the exam table without any problems, and Dr. Nagaldinne did not notice any foot drop.  (ECF No. 201, ¶23).

On August 15, 2006, Plaintiff claims that he was assisted to the medical unit.  (PSAF, ¶33).  Plaintiff claims that Dr. Nagaldinne told Plaintiff that he had already seen Plaintiff and that he could not help him.  (PSAF, ¶33; ECF No. 201, ¶24).  Plaintiff asserts that he left the medical unit without receiving any examination or treatment, or being inquired of his condition.  (PSAF, ¶33).  Dr. Nagaldinne, however, contends that he saw Plaintiff walk in without any difficulties and without any foot drop or other indicators of pain or discomfort.  (ECF No. 201, ¶59).  Dr. Nagaldinne contends that the MSR for the August 15, 2006 appointment was dated prior to the August 11, 2006 visit with Dr. Nagaldinne.  (ECF No. 201, ¶60).  Because the MSR was filed before the last examination and for the same condition, and because there was no change, Dr. Nagaldinne did not do an another physical examination.  (ECF No. 201, ¶¶61-62).

On August 23, 2006, Plaintiff saw Dr. Cleveland Rayford for some lab tests.  (ECF No. 201, ¶25).  The medical records from this visit do not indicate that Plaintiff complained about any foot problems at this visit.  (ECF No. 201, ¶26).

On December 7, 2006, Plaintiff went to the medical unit.  (ECF No. 201, ¶27).  The medical records do not indicate that Plaintiff complained of any foot pain (ECF No. 201, ¶28).

On January 11, 2007, Plaintiff told nurse O'Neail that he had problems with RA in the right ankle and wanted to see a doctor.  (ECF No. 201, ¶29).

On January 17, 2007, Plaintiff was evaluated by Dr. Rice, who diagnosed Plaintiff with foot drop. (PSAF, ¶39).

On January 29, 2007, February 1, 2007, and February 2, 2007, Plaintiff filed MSRs regarding intense pain. (PSAF, ¶40).

On February 2, 2007, Plaintiff was seen by Dr. Hendricks for complaints about RA related to his right ankle. (ECF No. 204-3, #2663). Plaintiff claims he was assisted to a visit with Dr. Hendricks. (PSAF, ¶41). Plaintiff contends Dr. Hendricks refused to physically examine Plaintiff, provide pain medication or review Plaintiff's medical history. (PSAF, ¶42). Plaintiff alleges that defendant Dr. Hendricks indicated that surgery to correct Plaintiff's medical issues was too expensive and would not be approved by defendant CMS.[1] (PSAF, ¶43). Instead, Dr. Hendricks gave Plaintiff a cane. (PSAF, ¶44).

On February 27, 2007, Plaintiff was noted to be ambulating with a "slap gate [sic] of the right foot." (ECF No. 201, ¶33).

On March 5, 2007, Plaintiff returned to defendant CMS and was evaluated by its physician, Dr. Rayford. (ECF No. 209, ¶131). Dr. Rayford noted that Plaintiff suffered from right foot drop. (Id.). Dr. Rayford requested that Plaintiff receive an MRI and evaluation by an orthopedic specialist. (Id., ¶132). On March 15, 2007, Plaintiff again saw Dr. Rayford. (ECF No. 201, ¶36; ECF No. 209, ¶133). Dr. Rayford ordered a referral for an MRI to assess the anatomy of Plaintiff's foot. (ECF No. 209, ¶134). Plaintiff notes that Dr. Rayford submitted this referral request for an MRI on March 15, 2007. (ECF No. 224-1, ¶134). Dr. Michael Sands approved the request for the MRI. (ECF No. 209, ¶134). On March 22, 2007, Plaintiff saw Dr. Rayford, who noted that Plaintiff still had foot drop and was walking with a cane. (ECF No. 209, ¶135).

On March 23, 2007, Plaintiff underwent an MRI on his lumbar spine. (ECF No. 209, ¶136). The MRI indicated (1) mild degrees of disc disease at L3-4 and L4-5 levels resulting in mild

_____

[1]Correctional Medical Services (CMS) is now known as Corizon Medical Services, Inc. The Court refers to it herein as CMS.

bilateral forminal stenosis at each level, and (2) L5-S1 level board based bulging, disc herniation on the right, mild left and moderate right forminal compromise. (Id.). On March 28, 2007, Dr. Rayford assessed Plaintiff with lumbar spine disc disease, with the foot drop probably from the disc disease. (ECF No. 209, ¶138). Dr. Rayford referred Plaintiff for an orthopedic consultation. (ECF No. 209, ¶139; ECF No. 224-1, ¶139). On March 29, 2007, Dr. Elizabeth Conley, Regional Medical Director of CMS, approved Dr. Rayford's referral request for Plaintiff to undergo an orthopedic consultation. (ECF No. 209, ¶140; Third Amended Complaint, ECF No. 157, ¶43).

On April 4, 2007, Dr. Rayford saw Plaintiff for a follow-up visit for his right foot drop, psoriatic arthritis, poor vision and cataract in his right eye. (ECF No. 209, ¶141). Dr. Rayford took Plaintiff's vital signs, assessed his visual impairments and noted that Plaintiff walked with a cane. (Id.). Dr. Rayford's plan was to keep Plaintiff's scheduled appointments with the orthopedist and rheumatologist, follow up with Plaintiff in 3-4 weeks, send a copy of the MRI to Dr. Rice, and refer Plaintiff to the opthamologist, Dr. Browning. (Id., ¶142).

On April 6, 2007, Plaintiff visited Dr. John Spears, a board certified orthopedic surgeon at the Missouri Spine Institute, regarding complaints of foot drop. (PSAF, ¶49; ECF No. 201, ¶41; ECF No. 209, ¶143). Dr. Spears reviewed Plaintiff's MRI taken on March 23, 2007. (PSAF, ¶51). Dr. Spears noted that Plaintiff suffered from complete foot drop and a severely atrophied and smaller calf. (PSAF, ¶52). Dr. Spears diagnosed Plaintiff with disc protrusion, disc collapse and stenosis within the foramen, causing compression on the right traversing S1 and the right exiting L5 nerve roots. (PSAF, ¶56). Dr. Spears recommended a microscopic transforminal lumbar interbody disc fusion (TLIF) at L5-S1 and stabilization of his neurologic problem. (ECF No. 209, ¶146). Dr. Spears testified to a reasonable degree of medical certainty that Plaintiff's spinal injury was the cause of his pain and foot drop. (PSAF, ¶63). Dr. Spears noted that, at the time Plaintiff was seen by Dr. Spears in April 2007, he was suffering from severe end-stage neurological deficit damage to

the nerves caused by compression (PSAF, ¶71). Dr. Spears noted that, if a compression is treated early, then there is a more likely chance of recovery than if it is at an end-stage neurological condition. (PSAF, ¶70). Dr. Spears described Plaintiff's condition at the time he saw him as "late or too late" for obtaining motor recovery. (PSAF, ¶71).

On April 10, 2007, Dr. Rayford made a referral request for "TCIF L5-S1," and this request was approved by Dr. Conley. (ECF No. 224-1, ¶147; ECF No. 209, ¶147).

On April 18, 2007, Plaintiff was seen and assessed by Dr. Rice, who noted Plaintiff's planned surgery and that he had foot drop for several months, as well as herniated discs. (ECF No. 209, ¶149). Dr. Rice noted Dr. Spears' pre-surgical request to discontinue prednisone and non-steriodial anti-inflammatory drugs ("nsaids"). (Id.).

On May 10, 2007, Dr. Spears performed surgery on Plaintiff's spine, which successfully removed all compression on the nerves at the L5-S1 level, and provided some pain relief but did not help Plaintiff's foot drop. (PSAF, ¶¶73, 75; ECF No. 209, ¶¶150, 152).

The following day, Plaintiff was transported back to FCC and admitted to the TCU (Transitional Care Unit). (ECF No. 209, ¶153). Plaintiff remained in the TCU until May 17, 2007. (ECF No. 209, ¶154). On May 18, 2007, Plaintiff requested and was given a new long-handled toothbrush. (ECF No. 209, ¶155).

On May 25, 2007, Plaintiff visited Dr. Spears for an initial post-operative evaluation. (ECF No. 209, ¶156). Dr. Spears noted that Plaintiff had no change in the motor strength of his right leg, "nor would we expect to." (Id.). Dr. Spears recommended that Plaintiff return to his RA medications, Ultram, and other medications that CMS allows for pain, and no non-steriodial anti-inflamatories for three months. (ECF No. 209, ¶157).

Dr. Rayford requested a specialist referral for Plaintiff to be fitted for an ankle foot orthosis ("AFO"). (ECF No. 209, ¶158). The referral was approved by Dr. Sands. (Id.). Dr. Rayford

requested a specialist referral for physical therapy for Plaintiff's right foot drop. (ECF No. 209, ¶159).

On June 6, 2007, Plaintiff met with a physical therapist at NHC Rehabilitation who recommended a neurological consultation, nerve conduction study, and who prescribed a four-week program. (ECF No. 204, p. 11; ECF No. 209, ¶161). Dr. Rayford made a referral request for a nerve conduction study and a neurologist consultation to assess the foot drop. (ECF No. 209, ¶162). Defendant Dr. Conley denied the request for the physical therapy program, without personally evaluating Plaintiff, because Dr. Spears had previously determined that Plaintiff's foot drop could not be reversed. (ECF No. 204, p. 11; ECF No. 209, ¶162). Dr. Conley deferred the nerve conduction study request until Dr. Spears further evaluated Plaintiff at the next appointment. (ECF No. 209, ¶162).

On June 11, 2007, Plaintiff was fitted with an AFO by a specialist at Mid-Missouri Orthotics and Prosthetics ("MMOP"). (ECF No. 209, ¶163). Plaintiff had no problems with the AFO. (Id.). It was recommended that Plaintiff receive new shoes. (Id.). Plaintiff's new shoes were ordered. (ECF No. 209, ¶164). During Plaintiff's RA chronic care appointment, Plaintiff continued to complain of right ankle swelling, burning, and numbness in his right foot and toes. (ECF No. 209, ¶165). Plaintiff rated his foot/ankle pain a 5-6 out of 10 and his back pain a 6-8 out of 10. (Id.).

In 2006 and 2007, CMS issued a guideline that abusable or narcotic medications, such as Ultra/Tramadol, should be administered in the infirmary. (ECF No. 209, ¶168). The CMS guideline was for safety and security purposes because narcotics are sought after in the inmate population. (ECF No. 209, ¶¶169-70). The guidelines evolved over the years because there were not enough infirmary beds to house all of the offenders on these types of medications. (ECF No. 209, ¶171). Offenders are now allowed to take abusable medications on a "watch take" basis. (Id.).

Dr. Rayford noted Plaintiff's prescription for Ultram and the need for Ultram to be administered in the TCU, but that Plaintiff did not want to stay in the TCU. (ECF No. 209, ¶167). For example, on July 9, 2007, Plaintiff refused his Ultram medication because he did not want to stay in the TCU as required. (ECF No. 209, ¶166).

Throughout June and July 2007, Plaintiff complained of decreased muscle strength, filed multiple MSRs, and made multiple urgent requests for Ultram. (ECF No. 204, p. 11). Nursing staff contacted Dr. Spears to discuss pain medication and use of Ultram/Tramadol. (ECF No. 209, ¶172). Dr. Spears was informed of the CMS policy regarding taking Ultram in the TCU. (Id.). Dr. Spears did not want Plaintiff in the TCU, but ambulating as much as possible. (Id.; ECF No. 224-1, ¶167). They discussed Plaintiff taking Tylenol if Dr. Spears did not want Plaintiff in the TCU. (ECF No. 209, ¶172). Defendants claim that Dr. Spears prescribed Tylenol to Plaintiff for pain. (ECF No. 204, p. 11). Plaintiff denies that Dr. Spears prescribed Tylenol. (ECF No. 224-1, ¶173).

Plaintiff states that his inability to receive Ultram left him in severe pain. (ECF No. 224-1, ¶167). Plaintiff notes that Dr. Rayford entered a referral request for Ultram under a "controlled med pass" rather than in the TCU on August 14, 2007, but that request was denied. (Id.). Plaintiff was eventually allowed to take Ultram without confinement to the TCU. (Id.).

On July 19, 2007, Dr. Rayford requested, and Dr. Conley approved, a referral for Plaintiff's third post-surgical follow-up with Dr. Spears. (ECF No. 209, ¶173).

On or about July 23, 2007, Plaintiff filed an emergency Informal Resolution Request ("IRR") with FCC's warden, seeking emergency treatment for his back pain. (Third Amended Complaint, ¶51). A draft lawsuit setting forth claims against defendant CMS, CMS personnel, and MDOC personnel regarding Plaintiff's medical treatment was attached to the IRR. (Id.).

On July 25, 2007, Plaintiff met with Dr. Rice for RA, and she recommended therapy for muscle stimulation to rule out peripheral nerve lesions. (ECF No. 204, p. 11; ECF No. 209, ¶175). The nerve conduction test was approved by Dr. Conley. (ECF No. 209, ¶176).

On July 28, 2007, Plaintiff tried on his new shoes with his AFO brace, but the shoe was not wide or deep enough to accommodate the brace. (ECF No. 224-1, ¶177).

On August 3, 2007, Plaintiff was seen by a physical therapist from NHC Rehabilitation. (ECF No. 224-1, ¶178). The physical therapist recommended nerve conduction testing, home exercise program (HEP), strengthening exercises and e-stim. (ECF No. 209, ¶179). Dr. Rayford requested these items and Dr. Conley approved the referral for nerve conduction testing and physical therapy 2-3 times per week for 4 weeks. (ECF No. 209, ¶180).

On August 13, 2007, Plaintiff was again evaluated by Dr. Spears, and he diagnosed Plaintiff with complete drop foot. (ECF No. 204, pp. 11-12; ECF No. 209, ¶181). Dr. Spears noted no improvement in the foot drop and again prescribed Ultram to treat Plaintiff's pain. (ECF No. 209, ¶181).

On August 14, 2007, Plaintiff received his new shoes and he reported that they fit great. (ECF No. 209, ¶182). Plaintiff's previous pair of shoes was not wide or deep enough to accommodate the brace. (ECF No. 209, ¶177).

On August 16, 2007, Plaintiff received a new, long-handled toothbrush. (ECF No. 209, ¶183).

On August 22, 2007, Plaintiff underwent a nerve conduction study of his right lower extremity and foot drop with Dr. Joann Mace. (ECF No. 209, ¶184). Dr. Mace's findings were consistent with denervation in L2,3,4,5 and S1. (ECF No. 209, ¶185). Dr. Mace found that there was little or no activity in the muscles below the knee. Dr. Mace recommended that Plaintiff be

referred to a peripheral nerve specialist, Dr. Susan MacKinnon, Shoenberg Professor and Chief, Division of Plastic and Reconstructive Surgery. (ECF No. 209, ¶185).

On August 28, 2007, Plaintiff saw a physical therapist regarding his atrophy and foot drop. (ECF No. 209, ¶187). The physical therapist recommended a new AFO, and Dr. Conley approved this request. (ECF No. 209, ¶¶187-88). On August 28, 2007, Dr. Rayford requested specialty shoes, but Dr. Conley denied the request for specialty orthopedic shoes. (ECF No. 209, ¶189). Defendant Dr. Conley also denied authorization for evaluation and treatment by peripheral nerve specialist, Dr. MacKinnon. (ECF No. 209, ¶190). Dr. Conley claimed that she denied the referral because Plaintiff had surgery and had been evaluated by his orthopedist, Dr. Spears. (Id.).

Plaintiff sent a letter, dated August 30, 2007, which was received by Melody Griffin, the Medical Contract Monitor for the Department of Corrections. (ECF No. 204-1, ¶40). Medical contract monitors are responsible for reviewing records and responding to inmate and inmate family complaints. (ECF No. 223-1, Additional Facts, ¶10). In his letter, Plaintiff states that CMS refused to treat him for a spinal cord injury and references a "59 page civil rights complaint." (ECF No. 223-1, ¶41). Ms. Griffin did not respond to the letter. (Id.).

Dr. Rayford made a referral request for Plaintiff to follow-up at MMOP for his AFO fitting. (ECF No. 209, ¶191). Dr. Sands approved the referral to MMOP. (Id.). At his appointment at MMOP, Plaintiff's brace did not fit into his shoes. (ECF No. 209, ¶192). MMOP kept the AFO until Plaintiff could order larger or specialty shoes. (Id.). Dr. Conley denied Dr. Rayford's request for Plaintiff to obtain specialty MMOP shoes. (ECF No. 209, ¶193). Dr. Conley recommended off-the-shelf shoes to accommodate Plaintiff's AFO. (Id.). On October 18, 2007, Plaintiff was seen at the medical unit with wide toe size 10.5 shoes. (ECF No. 209, ¶194). Dr. Rayford requested, and Dr. Conley approved, a referral to MMOP to be fitted for the AFO and adjust the left shoe. (Id.).

Plaintiff was seen at MMOP and fit with a new AFO, with which he was happy. (ECF No. 209, ¶195).

On October 24, 2007, Plaintiff complained of severe right foot and knee pain, and demanded to see the chronic care nurse. (ECF No. 209, ¶196). Plaintiff was seen on November 9, 2007 for complaints of right ankle pain and swelling around his brace. (ECF No. 209, ¶197). Dr. Rayford requested, and Dr. Sands approved, appointments for Plaintiff with Dr. Rice and Dr. Spears. (ECF No. 209, ¶198). On November 11, 2007, Plaintiff self-declared a medical emergency because of his ankle pain and swelling. (ECF No. 209, ¶199). Plaintiff was provided with gauze and padding that helped Plaintiff's comfort and fit of his AFO. (Id.).

On November 20, 2007, Plaintiff complained to nursing staff of severe right ankle pain, back and hip pain. (ECF No. 209, ¶200). Plaintiff complained that the Tramadol was not helping and complained that he had not seen Dr. Spears and Dr. Rice. (Id.). On November 25, 2007, Dr. Morrison gave a verbal order to renew Plaintiff's prescription for Tramadol. (ECF No. 209, ¶201). On December 5, 2007, Dr. Morrison assessed Plaintiff's medications and gave a verbal order to renew his other medications. (ECF No. 209, ¶202).

On December 3, 2007, Dr. Spears evaluated Plaintiff for a 3-month post-surgical consultation. (ECF No. 209, ¶204). Dr. Spears noted that Plaintiff was progressing and showed improvement in his lower extremity pain, with his strength lagging. (Id.).

On December 6, 2007, Defendant Lois Cella met with Plaintiff regarding his complaint that she refused to provide him with a long-handled toothbrush. (ECF No. 209, ¶205). Plaintiff claimed that another inmate told him that Cella was going to refuse the dentist to issue Plaintiff's his long-handled toothbrush. (Id.). After learning that Cella had not given another inmate his medical information, Plaintiff noted on his complaint letter that the issue was "resolved to his satisfaction, I humbly apologize." (ECF No. 209, ¶206). Plaintiff received his long-handled toothbrush. (Id.).

Plaintiff contends that he mailed a demand letter to certain CMS employees in November 2007, and Cella made comments to him regarding the lawsuit. (ECF No. 224-1, ¶206). Cella also emailed Earnest Jackson, a CMS dentist, regarding Plaintiff's need for a long-handled toothbrush if he was able to eat without requiring a "built up utensil" for eating. (ECF No. 224-13, at CMS 2173). In addition, Cella asked a food service worker to watch Plaintiff while he ate and to observe his manual dexterity. (ECF No. 224-1, ¶206). Plaintiff contends that he only apologized to Cella in order to obtain his long-handled toothbrush, which was confiscated shortly thereafter. (Id.).

On December 19, 2007, Plaintiff was seen by Dr. Gary Campbell to review Plaintiff's functional status related to his RA. (ECF No. 209, ¶207). Dr. Campbell examined Plaintiff's hand, elbow, shoulder and knee joint. (Id.). Dr. Campbell noted that Plaintiff removed his jacket without discomfort and got up from a seated position without stiffness or pain in his back or knees. (Id.). Dr. Campbell concluded that Plaintiff was doing well on his medications, including Tramadol, and Dr. Campbell determined that Plaintiff's long-handled toothbrush was no longer a medical necessity and discontinued the order for the long-handled toothbrush. (ECF No. 209, ¶208).

Dr. Rice saw Plaintiff on December 27, 2007 for his RA. (ECF No. 209, ¶209). During the examination, Dr. Rice noted right ankle pain, secondary to synvoid swelling, no other joint swelling, tender right radicular atrophy at leg below knee. (Id.). Dr. Rice recommended medications to treat Plaintiff's conditions, including 6 weeks of prednisone. (Id.).

Dr. Morrison requested, and Dr. Conley approved, that Plaintiff receive 6 weeks of prednisone as recommended by Dr. Rice. (ECF No. 209, ¶210). Dr. Morrison gave a verbal order to discontinue Plaintiff's Tramadol prescription and entered an order for 500 mg of naproxen per Dr. Spears's recommendation. (ECF No. 209, ¶211). Dr. Morrison entered a note that Plaintiff would be seen by a pain management specialist. (ECF No. 209, ¶214).

On or about January 9, 2008, Plaintiff filed a civil claim in this Court against defendant CMS, various CMS employees, and various MDOC employees.

On January 15, 2008, Plaintiff was transferred from FCC to Northeast Correctional Center (NECC). (ECF No. 209, ¶217). On January 16, 2007, Plaintiff requested that NECC's physician discontinue his medications. (ECF No. 209, ¶218). Plaintiff denies that he asked that all of his medication be discontinued, but he admits refusing certain psychiatric medications. (ECF No. 224-1, ¶218). From January 17 through January 29, and February 1 and 2, Plaintiff refused his psychiatric medications. (ECF No. 209, ¶218). On January 31, 2008, Plaintiff complained of ankle pain of 7-8 out of 10, foot drop and not getting relief from his medication. (ECF No. 209, ¶219).

On February 13, 2008, Plaintiff was seen by Dr. Rice, who recommended neurontin, an MRI of Plaintiff's lumbar spine, an adjustment of his AFO, and zantac. (ECF No. 209, ¶220; ECF No. 224-1, ¶220). The MRI was recommended for "new or persistent herniations/new compressions." (ECF No. 224-1, ¶220). Dr. Carera ordered the new medications recommended by Dr. Rice. (ECF No. 209, ¶221). Dr. Conley approved the request for a follow-up with Dr. Rice and deferred the request for an MRI on the basis that Plaintiff had a full work-up by Dr. Spears regarding his foot drop. (ECF No. 209, ¶222). Plaintiff requested and received an increased dosage of neurontin. (ECF No. 209, ¶223). While at NECC, Plaintiff was admitted to the chronic care clinic for pain. (ECF No. 209, ¶224).

On February 22, 2008, Plaintiff wrote to Larry Crawford, the Director of MDOC at that time, which was received by Defendant Griffin. (ECF No. 204-1, ¶43). Plaintiff wrote that he was recommended for a referral to Dr. MacKinnon by Dr. Mace but that CMS denied that visit. (ECF No. 223-1, ¶43). Plaintiff also referenced that the denial was on the basis of cost. (Id.). Plaintiff received a response from defendant Griffin, where she indicated that she referred the matter to defendant Dr. Sands. (ECF No. 204-1, ¶44). Dr. Sands told Griffin that Dr. MacKinnon reviewed

Plaintiff's medical records. (Id.). Griffin responded to Plaintiff's February 22, 2008 letter informing Plaintiff that an outside specialist's review is only to provide a recommendation and is intended only to assist the primary care doctor. (ECF No. 204-1, ¶45).

In March 2008, Plaintiff requested and received an increase in his dosage of neurontin. (ECF No. 209, ¶225). Dr. Conley also approved the request for Plaintiff's AFO to be adjusted and repaired at MMOP, and Plaintiff's request for new ted hoses to control swelling were also approved. (ECF No. 209, ¶226). Plaintiff also received a quad cane. (ECF No. 209, ¶227).

On April 15, 2008, Dr. MacKinnon wrote Dr. Sands to thank him for sending her Plaintiff's information. (ECF No. 209, ¶228). Dr. MacKinnon opined that there was no future care available to Plaintiff from a surgical point of view. (Id.). She offered to see Plaintiff, but doubted that she could offer anything to Plaintiff. (Id.). Dr. Sands does not recall receiving a letter from Plaintiff regarding Plaintiff's complaints with his medical care. (ECF No. 209, ¶229). Defendant Griffin, however, testified that she spoke to Dr. Sands about Plaintiff's complaints and that Dr. Sands then followed up with Dr. MacKinnon. (ECF No. 224-1, ¶229).

On April 22, 2008, Plaintiff complained that his newly adjusted AFO from MMOP broke. (ECF No. 209, ¶230). The broken AFO was repaired on-site. (Id.; ECF No. 224-1, ¶230).

On April 23, 2008, Plaintiff saw Dr. Rice for his follow-up appointment for RA, back pain, foot drop and neuropathic pain in his right leg. (ECF No. 209, ¶231). Dr. Rice recommended a continuation of medication and an L-Spine MRI. (Id.). Dr. Sands contacted Dr. Spears, who recommended a T-spine MRI only, and not a mid-back MRI as Dr. Rice had recommended. (ECF No. 209, ¶232). On July 14, 2008, Dr. Conley approved a new AFO for Plaintiff after his was deemed irreparable. (ECF No. 209, ¶234; ECF No. 224-1, ¶233).

In June 2008, Plaintiff complained of mid-thoracic pain and was seen by Dr. Roxas. (ECF No. 204, p. 12). Dr. Roxas consulted with Dr. Rice and Dr. Spears and scheduled an outside MRI,

xray, and consultation for Plaintiff. (Id.). The MRI was performed on August 7, 2008, and Plaintiff was sent to Dr. Spears for evaluation in October 2008. (ECF No. 209, ¶¶237, 239). Dr. Spears diagnosed Plaintiff with a disc herniation at the L4-L5 level, causing significant compression on a spinal nerve. (ECF No. 204, p. 12; ECF No. 209, ¶240). This condition required a microdiscectomy, which Dr. Spears performed on October 29, 2008. (ECF No. 204, p. 12; ECF No. 209, ¶242). Plaintiff was admitted to TCU from October 29, 2008 through October 30, 2008, and Plaintiff received Ultram medication. (ECF No. 209, ¶243). The second surgery did not alter the diagnosis of complete foot drop. (ECF No. 204, p. 12).

On November 17, 2008, Dr. Spears saw Plaintiff. Plaintiff reported his right leg pain was improved and his neurologic deficits were the same. (ECF No. 209, ¶244). Dr. Spears recommended that Plaintiff continue to use Ultram, with his other medications, and light activity while healing. (Id.).

In December 2008, Plaintiff's request for new shoes was approved. (ECF No. 209, ¶246).

In December 2008, defendant George Lombardi became the Director of MDOC. Beginning in March 2009, Plaintiff sent multiple letters to defendant Lombardi, alleging that defendant CMS's personnel retaliated against him for filing lawsuits and grievances regarding his medical care.

From January to May 2009, Plaintiff was seen by medical staff at NECC for his medication needs, RA, x-rays of his hands, blood work, a quad cane, foot pain, back pain, dental issues, and chronic care appointments. (ECF No. 209, ¶247). On May 15, 2009, Plaintiff was seen by the nurse for a self-declared medical emergency for right foot pain. (ECF No. 209, ¶248). The nurse noted red blotches that appeared to be pressure points from his brace and no swelling. (Id.). The doctor saw Plaintiff the following day and ordered an increase in Plaintiff's Tramadol dosage and renewed his other medications. (ECF No. 209, ¶249).

Dr. Rice recommended a neurologic consultation to evaluate Plaintiff's right leg pain and foot drop. (ECF No. 209, ¶251). Dr. Sands denied the request on the basis that Plaintiff's condition had been worked up numerous times and there was nothing more that could be done. (Id.). From June to December 2009, Plaintiff remained under the care of the site physician at NECC, the chronic care physicians for RA and chronic pain, Dr. Rice, and the nursing staff for his various medical and dental needs. (ECF No. 209, ¶252).

In November 2009, Defendant Griffin no longer received letters from Plaintiff because Defendant Gale Bailey, another MDOC Medical Contract Monitor, took over NECC complaints. (ECF No. 204-1, ¶47). On December 26, 2009, Plaintiff sent a letter to MDOC complaining that he had not been referred to Dr. MacKinnon, insufficient shoes, pain and lack of medication. (ECF No. 223-1, ¶48). Bailey sent Plaintiff a response, dated January 12, 2010, stating that Plaintiff had received the shoes and socks he requested, a referral in place for more ted hose, Plaintiff had an appointment with a chronic care physician on the day the letter was sent, and quoting the letter from Dr. MacKinnon indicating that she could not help Plaintiff. (ECF No. 204-1, ¶51). On January 15, 2010, Bailey received a letter from Plaintiff complaining that he had not been referred to Dr. MacKinnon and that he was being retaliated against by Dr. Sands. (ECF No. 204-1, ¶52; ECF No. 223-1, ¶52). Bailey responded to Plaintiff's January 15, 2010 letter, indicating that she forwarded his complaints to Dr. Conley for her review of the medical orders. (ECF No. 204-1, ¶53; ECF No. 223-1, ¶53). On February 4, 2010, Bailey received another letter from Plaintiff, again complaining that he had not been referred to Dr. MacKinnon, that he suffered severe pain, and that he was being retaliated against. (ECF No. 204-1, ¶54; ECF No. 223-1, ¶54). Bailey responded to Plaintiff's February 4, 2010 letter by referencing his medical records indicating that he was being treated for his complaints. (ECF No. 204-1, ¶55; ECF No. 223-1, ¶55).

Plaintiff filed the instant action on December 23, 2009. (ECF No. 209, ¶253). On December 31, 2009, Plaintiff's medical records state that the crushing of Tramadol was necessary due to its use outside the TCU. (ECF No. 209, ¶254). It was suggested that Plaintiff eat before taking his medication, if his tolerance was a problem. (Id.). Plaintiff, however, notes that the crush order was entered by Dr. Sands on December 29, 2010, just six days after Plaintiff filed his original suit in this action. (ECF No. 224-1, ¶254). Plaintiff states that a crush order was not necessary and that he had taken Tramadol at various times since April 2007 on a watch take basis. (Id.). Plaintiff contends that the crushed Tramadol was "disgusting," caused Plaintiff to vomit the medication, and left him in intense pain. (Id.). Plaintiff asserts that Dr. Sands declined to change the crush order even after he had been informed of its effect on Plaintiff. (Id.).

On January 5, 2010, Plaintiff's mother, Kathy Alicea called the MDOC to complain that Dr. Sands was retaliating against Plaintiff by crushing his medication in response to Plaintiff filing a lawsuit. (ECF No. 223-1, Additional Facts, ¶3). This matter was assigned to Bailey. (Id.). Bailey did not recall if she followed up on this matter. (ECF No. 223-1, Additional Facts, ¶4).

## DISCUSSION

## I. **DAUBERT** MOTIONS

### A. Standard for **Daubert** Motions

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed R. Evid. 702.

"'The main purpose of Daubert exclusion is to prevent juries from being swayed by dubious scientific testimony.'" Russell v. Whirlpool Corp., No. 12-1451, 2012 U.S. App. LEXIS 25650, at

*12 (8th Cir. Dec. 17, 2012) (quoting In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 613 (8th Cir. 2011)). "There are two requirements under Rule 702--(1) the knowledge must be scientific, technical, or other specialized knowledge; and (2) the knowledge must assist the trier of fact to understand the evidence or to determine a fact in issue." Larson v. Kempker, 405 F.3d 645, 650 (8th Cir. 2005). "The district court plays the role of a gatekeeper to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Russell, 2012 U.S. App. LEXIS 25650, at *12-13 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)).

"'Decisions concerning the admission of expert testimony lie within the broad discretion of the district court[.]'" Russell, 2012 U.S. App. LEXIS 25650, at *8 (quoting Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296, Freem. Ch. 1020 (8th Cir. 1996)). A district court abuses its discretion when it (1) does not consider a relevant factor that should have been given significant weight; (2) considers and gives significant weight to an irrelevant or improper factor; or (3) considers all and only proper factors but commits a clear error of judgment in weighing those factors. Russell, 2012 U.S. App. LEXIS 25650, at *8; Dunn v. Nexgrill Industries, Inc., 636 F.3d 1049, 1055 (8th Cir. 2011).

"A witness can be qualified as an expert by 'knowledge, skill, experience, training, or education,' Fed. R. Evid. 702, and it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001)(citing Kumho Tire Co., Ltd., 526 U.S. at 156). "Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's

expertise, which if not done can render expert testimony unreliable under Rule 702, <u>Kumho Tire</u>, and related precedents." <u>Wheeling Pittsburgh Steel Corp.</u>, 254 F.3d at 715.

"'As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" <u>Larson</u>, 405 F.3d at 651 (quoting <u>Hose v. Chicago NW Transp. Co.</u>, 70 F.3d 968, 974 (8th Cir. 1995); Fed. R. Evid. 703)). "[O]nly if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." <u>Loudermill v. Dow Chem. Co.</u>, 863 F.2d 566, 570 (8th Cir. 1988).

### B.     Motions to Exclude the Testimony of Plaintiff's Expert Dr. Joel Nitzkin

In two separate motions (ECF Nos. 199, 212), Dr. Nagaldinne, CMS, Dr. Sands, Dr. Conley, Dr. Rayford, Dr. Morrison, Dr. Hendricks, and Cella all move to exclude the testimony of Dr. Nitzkin.

Dr. Nitzkin is licensed to practice medicine in the State of Louisiana and specializes in public health and is board certified in preventative medicine. (PSAF, ¶¶78-79).  Dr. Nitzkin currently serves as an Associate Clinical Professor at Virginia Commonwealth University, School of Medicine, Department of Epidemiology and Community Health in Richmond, Virginia.  (PSAF, ¶80).  Beginning in the early 1970s, Dr. Nitzkin was employed by the Dade County Health Department and worked in correctional health.  (PSAF, ¶82). Dr. Nitzkin was also involved in correctional health as a County Health Director in Rochester, NY from 1976 through 1989.  (PSAF, ¶83).  Dr. Nitzkin  worked with the Jail Health Project of the American Medical Association in developing health standards that eventually became the National Commission on Correction Health Care (NCCHC).  (PSAF, ¶84).  Dr. Nitzkin has also been engaged as a liaison between the Louisiana Charity Hospital system and the state prison system, and other correctional institutions in Louisiana.

(PSAF, ¶88). Part of Dr. Nitzkin's liaison role was to identify ways to improve the quality of care received by inmates. (PSAF, ¶90).

Dr. Nitzkin issued an expert report on July 9, 2012. (PSAF, ¶99). Dr. Nitzkin reviewed the depositions of the physicians involved in this matter and relied on Dr. Spears' records, testimony, and opinions in this case. (PSAF, ¶¶92-93). Dr. Nitzkin stated in his expert report that Plaintiff's injury in August, 2006 constituted a serious medical need that, if untreated, would predictably result in severe pain and permanent disability. (PSAF, ¶100). Dr. Nitzkin believes that Plaintiff suffered a sudden extension of herniation of a lumbar disc that compressed a nerve root and instantly compromised his right leg and foot. (PSAF, ¶102). Dr. Nitzkin noted that Plaintiff's history of spinal disc disease and sudden onset of disability indicates a sudden expansion of disc herniation resulting in radiation of pain and foot drop. (PSAF, ¶103). Dr. Nitzkin states that foot drop should have been suspected and Plaintiff should have received immediate physician evaluation and diagnostic studies with follow-through for potential surgical correction "on an urgent basis." (PSAF, ¶104).

Defendants contend that Dr. Nitzkin is unqualified because he has not practiced medicine in a clinical environment since 1967--45 years ago. Dr. Nitzkin last provided care for a patient in 1989--23 years ago. Likewise, Dr. Nitzkin has never diagnosed RA, diagnosed foot drop or treated the condition. Moreover, Defendants note that Dr. Nitzkin has never ordered an MRI as a clinician and has never reviewed one, even though in his report Dr. Nitzkin contends that Dr. Nagaldinne should have ordered an MRI for Plaintiff. Defendants further claim that Dr. Nitzkin's opinions are unreliable because he lacks familiarity with the type of medicine relevant to Plaintiff's claims.

Defendants also maintain that Dr. Nitzkin's opinion is unreliable because his report is based upon the position that Plaintiff was telling the truth and Dr. Nagaldinne and his medical records were

not. Defendants contend that Dr. Nitzkin's report is improperly based upon a credibility determination, which is improper for expert testimony.

The Court denies Defendants' Motions to Exclude Dr. Nitzkin's testimony. The Court finds that Dr. Nitzkin's testimony is not beyond the scope of his expertise. Cf. Wheeling Pittsburgh Steel Corp., 254 F.3d at 715 (holding that the trial court improperly allowed a hydrologist to testify regarding safe warehousing practices where he lacked the education, employment, or other practical experiences to testify as an expert). The Court finds that Dr. Nitzkin's experience as a physician and public health director, including an emphasis in the prison setting, provides a sufficient foundation for his expert testimony. Dr. Nitzkin has significant experience working with the state prison system and performing quality assurance in the state prison system, which is at issue in this case. A mere lack of clinical experience is an insufficient basis to find Dr. Nitzkin is not qualified as an expert when he has provided quality assurance regarding these issues. Finally, the Court finds that Dr. Nitzkin's opinions properly can be considered by the jury. He reviewed Plaintiff's medical records and service requests, deposition transcripts, and the CMS Provider Information Program. Dr. Nitzkin is familiar with the appropriate standard of care, and he utilized his medical knowledge to apply that standard of care. Any critique Defendants may have regarding Dr. Nitzkin's credibility, given his education and experience, can be explored during cross-examination. Accordingly, the Court denies Defendants' motions to exclude Dr. Nitzkin's testimony.

**C.      Plaintiff's Motion to Exclude the Report and Opinions of Dr. Richard Lehman**

Dr. Richard Lehman is a board certified orthopedic surgeon. (ECF No. 209, ¶255). In his report, Dr. Lehman opines about the cause of Plaintiff's foot drop, whether Plaintiff received acceptable medical treatment, and whether the medication provided to Plaintiff was appropriate. (ECF No. 209, ¶¶256-77).

Plaintiff seeks to exclude the report and opinions of Dr. Lehman because, according to Plaintiff, his report purports to offer opinions outside of any area in which he qualifies as an expert and for which he has no foundation. Specifically, Plaintiff contends that Dr. Lehman should not be permitted to testify regarding issues related to a referral to Dr. Susan MacKinnon because his opinion regarding what she would do in a particular situation is merely speculation. Second, Plaintiff maintains that Dr. Lehman's qualifications as an orthopedic surgeon do not make him an expert on whether or not particular medical records were fabricated. Third, Plaintiff contends that Dr. Lehman should not be permitted to testify regarding Plaintiff's allegation that he was denied certain medical treatments on the basis of costs because Dr. Lehman has no expertise in this area. Finally, Plaintiff states that Dr. Lehman should not be permitted to testify regarding CMS policies for dispensing Ultram or Tramadol because he has no expertise regarding prison policies.

In addition, Dr. Lehman seeks to offer opinions regarding whether certain defendants have met the appropriate standard of care regarding their treatment of Plaintiff. Plaintiff contends that Dr. Lehman failed to consider the deposition testimony of any defendant medical provider in this case. Plaintiff asserts that Dr. Lehman should be precluded from offering any testimony regarding the appropriateness of the policies, procedures or practices of CMS regarding the care and treatment provided to inmates of the MDOC because he lacks any foundation to make offer such opinions. Plaintiff also believes that Dr. Lehman's opinions regarding individual medical providers should be excluded because his report does not discuss the specific care provided by each individual and Dr. Lehman admits that he never spoke to any of the defendant medical providers about their care of Plaintiff. Plaintiff claims that Dr. Lehman is without sufficient information regarding the care actually provided by the defendants and Dr. Lehman has no basis for his conclusions.

First, the Court finds that Dr. Lehman's opinions regarding Dr. MacKinnon are pure speculation that cannot be the subject of an expert opinion. Dr. Lehman simply opines what Dr.

MacKinnon would do in a particular situation, without any supporting factual basis. The Court finds this is improper expert opinion testimony and must be excluded. See, e.g., Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1084 (8th Cir. 1999) (finding opinion based on "unabashed speculation" fails the reliability prong of Daubert).

The Court, however, denies the remainder of Plaintiff's Motion because his arguments go to Dr. Lehman's credibility and not the admissibility of his testimony. See Larson, 405 F.3d at 651. The Court holds that, in response to Dr. Nitzkin's contrary opinions, Dr. Lehman can testify as to whether he believes that Dr. Nagaldinne's medical records were falsified. Dr. Lehman can offer his opinion based upon his review of the medical records and his experience with physicians and healthcare providers.

In addition, the Court finds that Dr. Lehman should be permitted to testify regarding whether Plaintiff was denied any medically necessary care based upon cost. As a medical professional, Dr. Lehman is capable of assisting a jury regarding whether the cost of care was a factor in providing Plaintiff care based upon Dr. Lehman's review of the care provided to Plaintiff as outlined in his medical records. Similarly, Dr. Lehman, as an orthopedic surgeon, can testify regarding whether he believes any purported delay affected Plaintiff's outcome.

Moreover, the Court finds that Dr. Lehman is qualified to testify regarding the use of Tramadol and dispensing Tramadol in the correctional setting, particularly as it relates to the abuse of narcotic pain medication. Dr. Lehman is not offered as an expert on prison policies. Dr. Lehman's testimony is limited to the effectiveness of Tramadol and appropriate means to decrease use of Tramadol. The Court finds that these are appropriate subjects for Dr. Lehman's testimony, given his experience prescribing these medications to patients suffering from orthopedic pain.

Finally, the Court finds that Plaintiff's bases for excluding Dr. Lehman's opinion regarding the care provided by the defendants to be unfounded. Dr. Lehman's opinions are limited to the

treatment by the individual defendants, not any CMS or MDOC policies. To the extent that Plaintiff contends that Dr. Lehman did not review sufficiently the medical records or defendants' depositions, Plaintiff can cross-examine Dr. Lehman in that regard. Dr. Lehman is qualified as an orthopedic surgeon to address the care and treatment of Plaintiff's orthopedic needs and drop foot.

## II.     MOTIONS FOR SUMMARY JUDGMENT

### A.     Summary Judgment Standard

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine

whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" <u>Torgerson</u>, 643 F.3d at 1042 (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

**B.    Defendant Govindarajulu Nagaldinne**

1.    §1983 Claims

Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. <u>Nelson v. Corr. Med. Servs.</u>, 583 F.3d 522, 531-32 (8th Cir. 2009) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). To establish deliberate indifference, Plaintiff "must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." <u>Id.</u> The second part of the test requires Plaintiff to prove that the prison officials were more than negligent. <u>Alberson v. Norris</u>, 458 F.3d 762, 765 (8th Cir. 2006). Plaintiff must show that the prison official's mental state was "akin to criminal recklessness." <u>Gordon ex. rel. Gordon v. Frank</u>, 454 F.3d 858, 862 (8th Cir. 2006).

Dr. Nagaldinne argues that he is entitled to summary judgment on Plaintiff's deliberate indifference claim. Dr. Nagaldinne contends that when Plaintiff presented to the medical unit on August 2, 2006, Plaintiff could move his foot up, but not side to side. Dr. Nagaldinne maintains that this is indicative of RA, not foot drop. (ECF No. 202, p. 3). Dr. Nagaldinne asserts that on August 11, 2006, he observed Plaintiff's movements, examined his muscle tone, and checked his reflexes and examined his foot. (<u>Id.</u>). On August 15, 2006, Dr. Nagaldinne did not perform a thorough examination because he had done so on Plaintiff's first visit and because Plaintiff's MSR predated the August 11, 2006 examination. (ECF No. 202, p. 4).

Even if Dr. Nagaldinne did not perform any examination on August 11, 2006, Dr. Nagaldinne contends this is within the standard of care because he observed Plaintiff walking into the medical unit and did not view him having any pain or difficulty ambulating. (ECF No. 202, p. 4). In addition, the records show that Plaintiff received treatment numerous times after August 15, 2006, but did not complain about his foot until January 2007, when there was an "exacerbation." (ECF No. 202, p. 5).

Finally, Dr. Nagaldinne claims that he is entitled to summary judgment because Plaintiff's experts cannot indicate when Plaintiff's nerve damage and foot drop commenced. (ECF No. 202, p. 5). Plaintiff's experts cannot state that they would have been able to diagnose foot drop in August 2006 or that Plaintiff's prognosis would have improved if surgery had been done in August 2006. (Id.).

Dr. Nitzkin, however, stated in his expert report that "[t]he harm that was done to Mr. Prosser by the failure of Dr. Nagaldinne to properly examine, diagnose and refer him for MRI and possible surgery cannot be over-emphasized." (Nitzkin Report, ECF No. 212-3, p. 12). Dr. Nitzkin stated that when Dr. Nagaldinne saw Plaintiff in August 2006, within two weeks of his original injury, "it is more likely than not that the possibility still existed for prevention of much, if not most of the pain and permanent disability experienced by Mr. Prosser." (Id.). Dr. Nitzkin also credited Plaintiff's version of these visits where Plaintiff states that he could not walk normally and was in pain. (Id.).

The Court finds that an issue of fact exists regarding whether Dr. Nagaldinne was deliberately indifferent to Plaintiff's serious medical needs. The Court first notes that an issue of fact exists regarding whether Plaintiff was displaying obvious signs of foot drop during his August 2006 visits with Dr. Nagaldinne. Likewise, an issue of fact exists regarding whether Plaintiff's life-long disability and severe pain could have been prevented if Dr. Nagaldinne had performed a full

examination and recommended an MRI. Dr. Spears attributed Plaintiff's August 2006 injury as the cause of his pain and foot drop. Dr. Spears noted that when he saw Plaintiff in April 2007 that he had suffered severe end-stage neurologic deficit from damage to the nerves. Thus, the failure to treat Plaintiff's compression injury early adversely affected his ability to recover.[2] Plaintiff claims, and his expert believes, that Dr. Nagaldinne "summarily dismiss[ed] Mr. Prosser's complaints, record[ed] a summary of a physical examination he did not do, and conclude[d], in writing, that Mr. Prosser had no need of further follow-up or any form of medication for his presenting complaint." (Nitzkin Report, pp. 12-13). Assuming these facts as true, the Court finds that an issue of fact exists regarding whether Dr. Nagaldinne's care fell so far below the reasonable standard of care as to amount to deliberate indifference. See Smith v. Jenkins, 919 F.2d 90, 92-93 (8th Cir. 1990)(physician's decision to take easier or less efficacious course of treatment, to intentionally maltreat inmate, or to refuse to provide essential care can constitute deliberate indifference; often whether misdiagnosis resulted from deliberate indifference or negligence is factual question requiring exploration by expert witnesses). Thus, viewing the disputed facts in the light most favorable to Plaintiff, the Court denies Defendant Nagaldinne's motion for summary judgment.

2.      Medical Malpractice

"Three elements must be established to make a prima facie case of medical malpractice: (1) 'proof that an act or omission of the defendant failed to meet the requisite medical standard of care,' (2) 'proof that the act or omission was performed negligently,' and (3) 'proof of a causal connection between the act or omission and the injury sustained by the plaintiff.'" Tompkins v. Kusama, 822

---

[2]The Court finds that this delay in treatment is most readily attributable to Dr. Nagaldinne. Dr. Nagaldinne saw him in August 2006 and he was not seen again for foot problems until, at the earliest, January 2007. To the extent that any delay is attributable to Dr. Rayford, Plaintiff has not alleged a §1983 claim against Dr. Rayford and, as discussed herein, Plaintiff fails to state a medical negligence claim against Dr. Rayford.

S.W.2d 463, 464 (Mo. Ct. App. 1991)(quoting <u>Yoos v. Jewish Hosp.</u>, 645 S.W.2d 177, 183 (Mo. App. 1982)); <u>Smith v. Tenet Healthsystem SL, Inc.</u>, 436 F.3d 879, 886 (8th Cir. 2006).

Pursuant to Missouri statute, "[i]n any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services, the plaintiff or the plaintiff's attorney shall file an affidavit with the court stating that he or she has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition." § 538.225.1, R.S.Mo. Under the statute, the term "legally qualified health care provider" means "a health care provider licensed in this state or any other state in the same profession as the defendant and either actively practicing or within five years of retirement from actively practicing substantially the same specialty as the defendant." § 538.225.2, R.S.Mo. The Eighth Circuit has held that this statute applies to claims filed in federal court. <u>See</u> <u>Keating v. Smith</u>, No. 12-1649, 2012 U.S. App. LEXIS 23513, at *2 (8th Cir. Nov. 16, 2012); <u>Mackovich v. United States</u>, 630 F.3d 1134, 1135 (8th Cir. 2011).[3]

Here, the parties agree that, if the Missouri statute applies in federal court, Dr. Nitzkin is not a "legally qualified health care provider." He has not actually practiced medicine as a patient care physician since 1967, and although he has reviewed medical records of a handful of patients for a period of time after that, he has not done that since 1989. Accordingly, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's medical malpractice claim against Dr. Nagaldinne.

---

[3]Plaintiff argues that that statute is procedural and not substantive and, therefore, Section 538.225.2 does not require dismissal. The Eighth Circuit rejected this argument in <u>Keating v. Smith</u>, 2012 U.S. App. LEXIS 23513, at *2.

**B.** **Defendants Corizon, Inc. f/k/a Correctional Medical Services, Inc., Dr. Michael Sands, Dr. Elizabeth Conley, Dr. Cleveland Rayford, Dr. Beverly Morrison, Dr. Laurain Hendricks, and Lois Cella**

1. 1983 claims

   a. Dr. Elizabeth Conley

Dr. Conley asserts that she is entitled to summary judgment. (ECF No. 210, p. 6). She states that she approved each and every request submitted to her, except for two requests for highly specialized care and one for orthopedic shoes. Dr. Conley outlines all of the medical treatment she approved of for Plaintiff. (Id.).

In turn, Plaintiff takes issue solely with the requests that Dr. Conley refused. Plaintiff contends that Dr. Conley was deliberately indifferent because she failed to correct Plaintiff's post-surgical pain medication issues and did not approve a necessary MRI in February 2008, which delayed treatment for a second herniation. (ECF No. 224, p. 5). Dr. Conley also denied two referral requests shortly after Plaintiff's initial back surgery--one for a nerve conduction study and one for a neurologist consultation. (Id.).

First, following Plaintiff's first back surgery and physical therapy, the physical therapist recommended a nerve conduction study and neurologist consultation. (ECF No. 210, p. 6). Dr. Conley claims that she deferred these requests based upon the opinion of Plaintiff's treating surgeon, Dr. Spears. (Id.). Dr. Conley believed at that time that Plaintiff's foot drop was irreversible and improvement could occur over the next year during his recovery. (Id.). Dr. Conley stated that she deferred the nerve conduction study until Dr. Spears further evaluated Plaintiff. (Id.). Dr. Conley claims that there was no medical necessity for a nerve conduction study at that time and there is no evidence that Plaintiff was harmed as a result of Dr. Conley's decision to defer the nerve conduction study. (Id.).

Dr. Conley also notes that in August 2007, she approved a nerve conduction study of Plaintiff's right lower extremity and foot. (ECF No. 210, p. 6). This study showed no activity in Plaintiff's peroneal nerve at his knee. (Id.). Dr. Conley claims that there is no evidence to demonstrate that had the testing been done a few weeks earlier, the results or treatment decisions would have changed. (Id., pp. 6-7).

Second, Dr. Conley claims that she was not deliberately indifferent by not referring Plaintiff to consult with a peroneal nerve specialist, Dr. Susan MacKinnon. (ECF No. 210, p. 7). The specialist who performed the nerve conduction study, Dr. Mace, recommended that Plaintiff consult with Dr. MacKinnon. Dr. Conley claims that she did not refer Plaintiff to Dr. McKinnon because he had been evaluated and was under the care of his orthopedic surgeon. (Id.). Dr. Conley notes that, nevertheless, Dr. Sands sent Plaintiff's records to Dr. MacKinnon for an independent medical review, and Dr. MacKinnon opined that there was nothing else she could offer Plaintiff. (Id.).

In response to these arguments, Plaintiff contends that Dr. Spears never indicated that improvement was impossible, just that a return to normal was impossible. (ECF No. 224, p. 5). Plaintiff notes that Dr. Conley failed to contact Dr. Spears for clarification or notify him that she was deferring the recommended treatment pending evaluation. (ECF No. 224, pp. 5-6). Dr. Nitzkin stated in his report that these denials resulted in delay and continued suffering by Plaintiff. (ECF No. 224, p. 6). Plaintiff contends that the fact that Dr. Sands later followed up with Dr. MacKinnon does not cure Dr. Conley's denial to refer Plaintiff to Dr. MacKinnon. (ECF No. 224, p. 6). In fact, Dr. Sands only referred Plaintiff to Dr. MacKinnon after a complaint was made to the MDOC, months after the initial referral. (ECF No. 224, p. 6).

Plaintiff also notes that Dr. Conley denied a request for special shoes and instead tried cheaper and "ineffective" footwear. (ECF No. 224, p. 6). Plaintiff claims that Dr. Conley's choice to provide Plaintiff with ineffective shoes and broken AFO caused Plaintiff considerable pain. (Id.).

Plaintiff also complains that Dr. Conley did nothing to remedy Plaintiff's inability to obtain pain medication unless he was confined in the TCU against Dr. Spears's orders. (ECF No. 224, p. 6). Plaintiff contends that Dr. Conley was aware of this issue but did nothing to remedy the problem. (Id., pp. 6-7). Dr. Nitzkin claims that Dr. Conley was "particularly unresponsive" to Plaintiff's continuing need for effective pain control. (Nitzkin Report, p. 16). For example, Dr. Nitzkin notes that Dr. Conley "played a major role in trying to restrict the use of Ultram," including imposing a series of restrictions including requiring Plaintiff to be in the TCU to receive his medication even though this was against Dr. Spears' orders. (Nitzkin Report, p. 17).

Finally, Plaintiff maintains that Dr. Conley improperly denied a request for review of an MRI recommendation from Dr. Rice in early 2008. (ECF No. 224, p. 7). Dr. Conley's denial of the MRI resulted in further delay in Plaintiff's second MRI which discovered additional herniation. (Id.).

When, as in the instant case, "the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (quoting Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995)). "To establish this effect, the inmate 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment . . . [,]" id. (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)), unless the medical need would be obvious to a layperson, Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011))(finding that new bedsores, some of which were infected and odoriferous, lack of grab bars, inadequate changes of dressings, and no bathing of paraplegic prisoner presented need for medical attention that would be obvious to lay person). Additionally, "[t]he Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." Jenkins v. Cnty. of Hennepin, Minn., 557 F.3d 628, 633 (8th Cir. 2009).

Here, the Court finds that the evidence establishes that Dr. Conley promptly and appropriately responded to several requests for specialized care. Dr. Conley only refused or deferred two requests for highly specialized care--a neurological consultation, and a nerve conduction study-- and for orthopedic shoes. These limited and reasoned denials cannot constitute deliberate indifference. Cf. Estelle, 429 U.S. at 107 (where medical personnel saw inmate 17 times in 3 months and treated back strain with bed rest, muscle relaxants, and pain relievers, their failure to x-ray inmate's back or implement other diagnostic techniques or treatment was not deliberate indifference). As discussed, Dr. Conley did not approve the request from Plaintiff's physical therapist for a nerve conduction study and neurologist consultation based upon the opinions of Plaintiff's treating surgeon, Dr. Spears. Dr. Spears testified that he did not order a nerve conduction study or believe that one was medically necessary. The Court finds this to be a reasonable treatment decision and, even if later found to be wrong, cannot be considered deliberate indifference. The mere fact that an inmate disagrees with the course of treatment does not, in and of itself, suffice to establish a violation of the Eighth Amendment. Likewise, the denial of a particular course of treatment does not constitute deliberate indifference. See Peterson, 2012 U.S. Dist. LEXIS 132848, at *40 (quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)("the Court is reminded that 'society does not expect that prisoners will have unqualified access to health care,' and that '[a]s long as th[e] threshold [of deliberate indifference] is not crossed . . . prison doctors remain free to exercise their independent medical judgment.'"); see also Vaughn v. Gray, 557 F.3d 904, 909 (8th Cir. 2009)(an inmate's Eighth Amendment rights are not violated by defendants' refusal "to implement a prisoner's requested course of treatment") (internal citation omitted). And, likewise, prison physicians are free to exercise their independent medical judgment. See Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1118-19 (8th Cir. 2007); Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (prison doctors remain free to exercise their independent medical

judgment). Moreover, the Court does not believe that denying Plaintiff's request for special orthopedic shoes from MMOP constituted an unconstitutional deprivation of care. The medical unit ordered shoes to fit Plaintiff's AFO and Plaintiff had multiple appointments to ensure a good fit and function with Plaintiff's AFO and his feet. The mere fact that Dr. Conley chose a different course of treatment for Plaintiff does not constitute deliberate indifference. Peterson, 2012 U.S. Dist. LEXIS 132848, at *40.

Likewise, the Court finds that Plaintiff's claim regarding Dr. Conley's oversight of Plaintiff's pain medication fails. The Court finds that all of the issues identified by Dr. Nitzkin were the result of Plaintiff's refusal to comply with the order that medications be administered in the TCU. Defendants identified a rational and reasonable basis for this policy and that Dr. Conley cannot be held to be deliberately indifferent for adhering to CMS policy.[4] The Court will grant Dr. Conley's motion for summary judgment on the pain management issue.

Finally, the Court does not believe that an issue of material fact exists regarding whether Dr. Conley's refusal to allow an MRI in February 2008 and the resulting delay in treatment constitutes deliberate indifference. Dr. Conley relied on the fact that Dr. Spears had performed a full work up on Plaintiff just a few months before. Dr. Conley, in her medical opinion, did not believe that any benefit would arise from another MRI. The Court finds that Dr. Conley's decision was reasoned and does not constitute deliberate indifference.

Accordingly, the Court grants Motion for Summary Judgment on Plaintiff's deliberate indifference claim against Dr. Conley.

---

[4]The Court also takes judicial notice of the fact that other correctional facilities had similar policies. See Peterson v. Corr. Med. Servs., No. 4:10cv1866, 2012 U.S. Dist. LEXIS 132848, at *30 (E.D. Mo. Sept. 18, 2012)("The director informed him that the policy was not to allow narcotic pain relievers outside of the infirmary. ... Plaintiff was advised to file a request for a doctor appointment if his current prescriptions and treatment needed to be reevaluated.").

b.      Dr. Michael Sands

Plaintiff asserts that Dr. Sands, a CMS medical director, was deliberately indifferent because he delayed medical treatment. Additionally, Plaintiff alleges in his Third Amended Complaint, and Dr. Nitzkin suggests in his report, that Dr. Sands was deliberately indifferent for delaying ordering Plaintiff's second MRI. Finally, Plaintiff contends that Dr. Sands retailed against Plaintiff by ordering his medication be crushed.

i.      Deliberate Indifference

First, Plaintiff contends that Dr. Sands did not timely refer Plaintiff to Dr. MacKinnon. (ECF No. 224, p. 7). Plaintiff argues that Dr. Sands' referral to Dr. MacKinnon was untimely because it was only done after being contacted by the MDOC. Plaintiff maintains that Dr. MacKinnon offered to evaluate Plaintiff for a dorsal column stimulator for pain, but no follow up was done for Plaintiff's pain. (Id.).

Dr. Sands argues that he did not refer Plaintiff to Dr. MacKinnon for further treatment based upon her own statements after reviewing Plaintiff's medical records. Dr. MacKinnon wrote to Dr. Sands and stated that she would see Plaintiff but she was "doubtful she could offer anything to him." (ECF No. 210, p. 8). Dr. Sands states that he appropriately considered Dr. MacKinnon's opinions and decided that future care with her was not medically necessary under the circumstances. (ECF No. 210, p. 8). In addition, Dr. Sands maintains that Plaintiff's claim that incomplete medical records were sent is not supported anywhere in the records. (Id.).

Although Dr. Nitzkin indicates that Dr. Sands provided inaccurate information to Dr. MacKinnon (Nitzkin Report, p. 17), nothing in the record indicates that Dr. MacKinnon received incomplete medical records. After Dr. MacKinnon indicated that she could not offer Plaintiff much in the way of future care, the Court finds that Dr. Sands was not deliberately indifferent for denying a referral to Dr. MacKinnon, which Dr. MacKinnon believed would not be fruitful. The Court

grants summary judgment to Dr. Sands on Plaintiff's claim that he was deliberately indifferent regarding his referral to Dr. MacKinnon.

In addition, Plaintiff alleges and Dr. Nitzkin testified that Dr. Sands was deliberately indifferent because he delayed requesting an MRI for several months in 2007. (Third Amended Complaint, ¶74; Nitzkin Report, p. 17). Dr. Nitzkin claims that Dr. Sands was aware of Dr. Rice's recommendation for an MRI in January 2007, but he delayed the MRI until April 2007. Dr. Nitzkin argues that this "lack of urgency is a major issue since the obvious most likely cause of Mr. Prosser's disability and pain is a cause that Dr. Sands should have recognized as one that could benefit from prompt surgical intervention." (Id.). The Court holds that the facts do not support a finding of deliberate indifference. Dr. Sands quickly approved an MRI on March 5, 2007, when it was requested by Dr. Rayford and, on March 23, 2007, Plaintiff underwent an MRI on his lumbar spine. The Court finds that there was no substantial delay in treatment. Moreover, even if there was a delay of, at most two months, Dr. Nitzkin does not specifically identify how this delay affected Plaintiff's prognosis. See Laughlin, 430 F.3d at 929 (when inmate alleges that delay in treatment rises to level of Eighth Amendment violation, objective seriousness of deprivation should be measured by reference to effect of delay, and to establish this effect inmate must place verifying medical evidence in record); Coleman v. Rahija, 114 F.3d 778, 785 (8th Cir. 1997) (inmate offered "sufficient 'verifying medical evidence'"--in form of expert testimony--that defendant ignored critical or escalating situation or that delay posed substantial risk of serious harm); Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir. 1994) (per curiam) (defendant may be liable for delay in treatment if he ignored acute or escalating situation, given type of injury in case); Crowley, 109 F.3d at 502; Pendleton v. Finley, No. 2:10-cv-02026, 2012 U.S. Dist. LEXIS 105491, at *34-35 (W.D. Ark. July 30, 2012)(same); Pfeiffer v. Butler County Sheriff Dep't, No. 1:10cv672, 2012 U.S. Dist.

LEXIS 49898, at *23-24 (S.D. Ohio Apr. 10, 2012)("Pfeiffer submits no verifying medical evidence sufficient to demonstrate that a delay in treatment caused a serious medical injury").

ii.      Retaliation

Plaintiff contends that Dr. Sands' order in December 2009 to crush Plaintiff's pain medicine constitutes deliberate indifference and retaliation. (ECF No. 224, pp. 7, 12-13). Plaintiff was prescribed Ultram/Tramadol for significant period starting in April 2007. (ECF No. 224, pp. 7-8). Plaintiff states that he had been allowed to take the medicine on a "watch take" basis. However, just days after Plaintiff filed this lawsuit in December 2009, Dr. Sands entered a crush order for administering Plaintiff's pain medication. (ECF No. 224, pp. 8, 13). Plaintiff asserts that the crush order resulted in significant pain because it made Plaintiff vomit his medication, effectively removing it from his system before it could be effective. Drs. Spears, Rice and others recognized Plaintiff's pain as an objectively serious medical need. (ECF No. 212-3, p. 17).

"To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that [he] engaged in a protected activity, (2) that the defendants responded with adverse action that would 'chill a person of ordinary firmness' from continuing in the activity, and (3) that 'the adverse action was motivated at least in part by the exercise of the protected activity.'" L.L. Nelson Enters., Inc. v. Cnty. of St. Louis, Mo., 673 F.3d 799, 807-08 (8th Cir. 2012)(quoting Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)).

The Court finds that an issue of fact does not exist regarding whether Dr. Sands ordered Plaintiff's medication to be crushed in retaliation for filing a lawsuit. The Court acknowledges that filing an inmate lawsuit is protected First Amendment activity. Beaulieu v. Ludeman, 690 F.3d 1017, 1025 (8th Cir. 2012) (filing of inmate lawsuit is protected First Amendment activity). However, Plaintiff's argument that Dr. Sands retaliated against him by issuing a crush order of his Tramadol is not supported in the record. Dr. Sands explained that the crush order was made

pursuant to policy and as a result of safety concerns regarding narcotics in prisons. Likewise, as discussed herein, a crush order had been in place previously for Plaintiff's narcotic medications.[5] Taking these facts along with Plaintiff's history of refusing medication and refusing to comply with CMS's medication policy, the Court finds that the record does not support a First Amendment retaliation claim. Only speculation and conjecture support Plaintiff's retaliation claim; the mere temporal proximity between the protected activity and the purported retaliatory activity is insufficient to support a retaliation claim. See Johnson v. Ark. State Hosp., 282 Fed. Appx. 497, 499 (8th Cir. 2008)(First Amendment retaliation claim fails where, even assuming he engaged in protected speech, plaintiff presented no evidence of a causal connection between the speech and the purported retaliatory activity (except for the temporal proximity)). Accordingly, the Court finds that Plaintiff's claim of deliberate indifference and retaliation against Dr. Sands fail as a matter of law.

c.     Dr. Laurain Hendricks

Plaintiff contends that he sought treatment from Dr. Hendricks for severe pain and foot drop that had been diagnosed by Dr. Rice two weeks prior. (ECF No. 224, p. 9). Plaintiff contends that Dr. Hendricks failed to review his medical history, conduct a physical exam, order any tests or even prescribe pain medication. (Id.). Plaintiff contends that Dr. Hendricks told him that surgery would be too expensive and just gave him a cane. (Id.). Basically, Plaintiff maintains that Dr. Hendricks denied him care based upon the cost of treatment and provided grossly inadequate treatment.

Dr. Hendricks only saw Plaintiff on one occasion and she entered a verbal order for Plaintiff's use of Ultram immediately after surgery. (ECF No. 210, p. 10). Dr. Hendricks asserts that Plaintiff came to see her to obtain a cane. Dr. Hendricks maintains that, during her visit with Plaintiff on February 2, 2007, she reviewed Plaintiff's medical history, documented Plaintiff's

---

[5]The Court again takes judicial notice of the fact that other correctional facilities had similar policies. See Peterson, 2012 U.S. Dist. LEXIS 132848, at *30.

subjective complaints and noted that he walked with a limp. (ECF No. 210, pp. 10-11). Consistent with Plaintiff's medical history, Dr. Hendricks states that she assessed Plaintiff with RA and requested a wooden cane for him for support. (ECF No. 210, p. 11). Dr. Hendricks states that, in her medical judgment, she did not observe or note that Plaintiff suffered from drop foot at that time. (Id.). Dr. Hendricks asserts that she provided the care that was medically appropriate and was not deliberately indifferent. (Id.).

The Court finds that Dr. Hendricks was not deliberately indifferent to Plaintiff's medical needs. The record indicates that Dr. Hendricks reviewed Plaintiff's medical history and provided treatment to Plaintiff by ordering a cane. Dr. Hendricks diagnosed Plaintiff with RA, not foot drop, and treated him accordingly. Dr. Nitzkin asserts in his report that Dr. Hendricks should have recognized that Plaintiff had "a condition amenable to surgical intervention." (Nitzkin Report, p. 14). To the extent that Dr. Hendrick's diagnosis was incorrect as Dr. Nitzkin claims, Plaintiff's claim is for medical negligence, not deliberate indifference. See Crooks v. Nix, 872 F.2d 800, 805 (8th Cir.1989)(citing Estelle, 429 U.S. at 104 ("plaintiff, to make a cognizable § 1983 claim, must allege more than medical malpractice; a prisoner must allege a constitutional violation of 'deliberate indifference to a serious medical need'").[6] Thus, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's §1983 claim against Dr. Hendricks.

d.      Dr. Beverly Morrison

Dr. Morrison treated Plaintiff in November and December 2007. (ECF No. 210, p. 11). On December 5, 2008, Plaintiff saw Dr. Morrison related to his back pain complaints. Plaintiff contends that Dr. Morrison refused to listen to Plaintiff's issues regarding the source of his pain and Dr. Morrison told Plaintiff that she would only review his medication. (ECF No. 224, p. 10). Plaintiff

---

[6]For the reasons stated previously, Plaintiff's claim against Dr. Hendricks for medical negligence fails.

alleges that Dr. Morrison did not evaluate him for his increasing pain and he was later diagnosed with a second, painful disc herniation. (Id.). In addition, Plaintiff contends that that Dr. Morrison retaliated against him after he included claims against her in a lawsuit. On or around December 18, 2007, Plaintiff mailed the lawsuit, which included claims against Dr. Morrison, to Dr. Morrison. Shortly thereafter, Dr. Morrison discontinued Plaintiff's pain medication, which Plaintiff alleges was in retaliation for filing a lawsuit which included claims against Dr. Morrison. In his expert report, Dr. Nitzkin states that Dr. Morrison demonstrated deliberate indifference by discontinuing his pain medication, without good justification. (Nitzkin Report , p. 15).

Dr. Morrison asserts that she properly evaluated and treated Plaintiff and was not deliberately indifferent to his serious medical needs. Dr. Morrison states that she renewed Plaintiff's prescription for Tramadol in November 2007, and gave a verbal order for other medications. (ECF No. 210, p. 11). On December 7, 2007, three months after Plaintiff's TFIL surgery, Dr. Morrison gave a verbal order to discontinue Plaintiff's Tramadol prescription and substitute it with 500 mg of naproxen. (ECF No. 210, p. 11). Dr. Morrison claims that, in her clinical judgment, Plaintiff no longer had a need for Tramadol. (ECF No. 210, p. 12). Moreover, Dr. Morrison stated, based upon her patients' experience with Tramadol and recent medical literature, she discontinued prescribing Tramadol, an addictive narcotic pain medication, and instead prescribed Plaintiff a less addictive pain reliever. (Id.). Dr. Morrison claims that there is nothing in the record to suggest that she discontinued prescribing Tramadol due to deliberate indifference.          The Court finds Plaintiff's claim for deliberate indifference against Dr. Morrison fails as a matter of law. Although Plaintiff and his expert disagree with Dr. Morrison's treatment, this decision does not constitute deliberate indifference. The Court finds that Dr. Morrison provided a reasonable basis for discontinuing Plaintiff's Tramadol that precludes any claim of deliberate indifference. See Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors were not deliberately indifferent where they treated

prisoner on numerous occasions and offered sensible medication and treatment). Furthermore, the Court notes that Dr. Morrison's decision to discontinue Plaintiff's Tramadol occurred prior to Plaintiff mailing her a copy of the lawsuit naming her as a defendant. Thus, Plaintiff cannot demonstrate that the allegedly retaliatory action was motivated by Plaintiff's protected activity because Dr. Morrison discontinued Plaintiff's Tramadol before Dr. Morrison received a copy of Plaintiff's lawsuit. See Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) ("lack of a temporal connection between the protected activity and the alleged retaliation dispels any inference of causal connection"). Thus, the Court grants Dr. Morrison's motion for summary judgment.

f.    CMS

"[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies." Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-976 (8th Cir. 1993)(citing Monell v. Department of Social Servs., 436 U.S. 658, 690 (1978)). "The proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983." Sanders, 984 F.2d at 976 (citing Monell, 436 U.S. at 694).

Plaintiff contends that several of CMS's policies violate §1983. First, CMS required admission to the TCU to receive pain medication. (ECF No. 224, p. 13). Because of this policy, Plaintiff was unable to get his medication on several occasions, causing him severe pain. Moreover, Plaintiff claims that this policy was unnecessary because the former "watch take" policy was effective. Finally, Plaintiff contends that the exceptions to the rule requiring administering medicine in the TCU are not clearly established, which results in inconsistent administration and denial of care.

Second, Plaintiff alleges that CMS allowed non-treating physicians to control access to care through its referral system. (ECF No. 224, p. 13). That is, CMS requires approval from off-site

corporate doctors to obtain required medical treatment. Plaintiff asserts that this policy results in a denial of medical care deemed appropriate by the patient's treating physician.

Finally, CMS has an orientation program that emphasizes cost and compliance over patient care. (ECF No. 224, pp. 13-14). Plaintiff asserts that he was denied care by at least two doctors, Dr. Nagaldinne and Dr. Hendricks, on the basis that the treatment would be too costly.

The Court finds that Plaintiff's claims against CMS fail as a matter of law. The Court holds that CMS's policy requiring administration of narcotic medication in the infirmary does not constitute deliberate indifference. See Peterson, 2012 U.S. Dist. LEXIS 132848, at *46 (holding that plaintiff's allegation that he was denied prescribed pain medication because of a MDOC policy that narcotic pain medications must be given in the infirmary fails to establish an Eighth Amendment violation); see also Steele v. Weber, 278 Fed. Appx. 699, 700 (8th Cir. 2008) (per curiam) (rejecting inmate's claim that Eighth Amendment rights were violated when prison doctors refused to prescribe him high-dose narcotic pain medication; claim described "mere disagreement with course of treatment"). The CMS policy served a legitimate purpose of promoting the safety and well-being of the inmates. Plaintiff has not shown that he was required to obtain his medication in the TCU for some malicious purpose or that he was treated differently than any other inmates. Accordingly, the Court finds that this policy cannot be the basis of §1983 liability.

Likewise, the Court finds that Plaintiff's claim that he was denied medical treatment because of cost basis fails as a matter of law. CMS argues that there is no evidence to support Plaintiff's claim that CMS maintained unconstitional policies related to administering physician's orders and maintaining medical supplies. (ECF No. 210, p. 16). CMS points to the record that show that since 1992 the vast majority of Plaintiff's physician's orders were implemented and he received the course of treatment recommended. (Id.). "Even a cursory reading of Plaintiff's medical history establishes that he was consistently referred to outside specialists ... for diagnostic and remedial tests and

procedures." Peterson, 2012 U.S. Dist. LEXIS 132848, at *50. As noted by Defendants, the vast majority of the requested treatment and referrals for Plaintiff were approved. The record reveals that only a couple of specialized procedures, referrals to specialists and orthopedic shoes were denied or deferred. The Court finds this to be insufficient to demonstrate a policy that CMS physicians' decisions were financially motivated.

Thus, the Court finds insufficient evidence offered here to create a jury question on CMS's section 1983 liability and grants summary judgment in favor of Defendants.

### 2. Medical Negligence

Plaintiff alleges that Drs. Rayford,[7] Hendricks, Morrison, Conley, and Sands were medically negligent in their treatment. As discussed previously, however, Plaintiff's medical negligence claims fail because Dr. Nitzkin is not a "legally qualified health care provider," as required under the statute. See §538.225.1-2, R.S. Mo. Accordingly, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's medical negligence claims against Drs. Rayford, Hendricks, Morrison, Conley, and Sands.

### 3. Retaliation[8]

Plaintiff contends that Lois Cella interfered with Plaintiff obtaining a prescribed long-handled toothbrush and prescription pain medication. In early December, Plaintiff mailed a letter to Ms. Cella complaining that he was having issues getting his long toothbrush and claimed that Cella was involved. (ECF No. 224, p. 12). Plaintiff contends that Cella refused to give Plaintiff a new toothbrush until he signed an apology to Cella regarding his complaint letter. (Id.).

---

[7]Plaintiff asserts a claim against Dr. Rayford only for medical negligence not deliberate indifference. (ECF No. 224, p. 8).

[8]The Court discussed Plaintiff's retaliation claim against Dr. Sands and Dr. Morrison in the deliberate indifference section.

In addition, Plaintiff contends that "reasonable evidence" supports a finding that Cella authored a January 2008 note to Dr. Rice to cancel a faxed Tramadol prescription for Plaintiff. (ECF No. 224, p. 12). Plaintiff contends that other comments in the unsigned MARS note relate to Plaintiff asking for copies of his medical records in regards to his lawsuit and correspond closely with comments that Cella was making around this time. Plaintiff, therefore, concludes that there is "reasonable evidence to infer that Ms. Cella authored the note and interfered with the prescribed medication." (Id.).

The Court grants summary judgment in favor of Cella on Plaintiff's retaliation claim. In contrast with the record, Plaintiff's retaliation claim consists of nothing but speculation and conjecture to support his claim that he suffered any adverse action in his medical care because he exercised his right to expression. The record indicates that after he learned that Cella had not given another inmate his medical information, Plaintiff noted on his complaint that the issue was "resolve[d] to his satisfaction" and that he "humbly apologize[d]." Plaintiff cannot demonstrate that he did not receive a toothbrush or that his Tramadol prescription was canceled because he engaged in protected speech.

### C.     Defendants George Lombardi, Melody Griffin, and Gale Bailey

Defendant Lombardi is the Director of the Department of Corrections. (ECF No. 204-1, ¶57). Due to the large volume of complaints filed by inmates, Lombardi cannot personally read, investigate and respond to each offender letter he receives. (Id.). Lombardi utilizes medical contract monitors, such as Defendants Bailey and Griffin, to receive and respond to letters from inmates who claim they are not receiving medical care. (ECF No. 204-1, ¶58). Defendants Bailey and Griffin are registered nurses, not doctors, who do not have the experience, training, knowledge or license to question or change diagnoses and treatment plans of doctors. (ECF No. 204-1, ¶¶60-61).

In Counts XIII, XIV, and XV, Plaintiff alleges Defendants Lombardi, Griffin, and Bailey, MDOC employees, tacitly authorized CMS defendants' deliberate indifference to Plaintiff's serious medical needs in violation of his Eighth Amendment rights. Plaintiff also alleges that Defendants Lombardi and Griffin tacitly authorized Lois Cella and Dr. Sands's retaliation in violation of his First Amendment rights.

Prison supervisors can incur liability "for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010). "A supervisor may be found liable for failure to supervise or control his subordinates only where a plaintiff establishes his 'deliberate indifference or tacit authorization of the offensive acts by failing to take remedial steps following notice of a pattern of such acts by his subordinates.'" Junaid v. Kempker, No. 4:04CV57 CDP, 2009 U.S. Dist. LEXIS 25940, at *19 (E.D. Mo. Mar. 27, 2009)(quoting Wilson v. City of N. Little Rock, 801 F.2d 316, 322 (8th Cir. 1986)). "'Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished.'" Langford, 614 F.3d at 460 (quoting Crooks v. Nix, 872 F.2d 800, 804 (8th Cir. 1989)). "It follows that 'where the duty to furnish treatment is unfulfilled, the mere contracting of services with an independent contractor does not immunize the State from liability for damages in failing to provide a prisoner with the opportunity for such treatment.'" Id.

1. Res Judicata re Claim Against Griffin

"Under Missouri law, 'the doctrine of res judicata, or claim preclusion, bars relitigation of the same cause of action by the same parties or privities in a case if the two actions have the following common identities: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the parties to the action; and (4) identity of the quality of the person for or against whom the claim is made.'" Niere v. St. Louis County, 305 F.3d 834, 837 (8th Cir. 2002)(quoting

Williams v. Finance Plaza, Inc., 78 S.W.3d 175, 183 (Mo. Ct. App. 2002)).  Because claim preclusion prohibits splitting claims, claims arising out of the same course of action that could have been brought in the first lawsuit are precluded from relitigation in the second suit.  Niere , 305 F.3d at 837-38 (citing Chesterfield Village v. City of Chesterfield, 64 S.W.3d 315, 318-19 (Mo. 2002)).

Defendants contend that res judicata bars claims against Griffin.  Plaintiff previously filed a lawsuit raising a claim under 42 U.S.C. §1983 that Larry Crawford, former Director of the Department of Corrections, tacitly authorized CMS defendants to be deliberately indifferent to Plaintiff's serious medical needs.  Prosser v. Hendricks, Case No. 4:08cv44DJS (E.D. Mo.).  The district court granted Defendant Crawford's motion to dismiss and the Eighth Circuit Court of Appeals affirmed the dismissal.  Prosser v. Hendricks, 371 F. App'x 710, 711 (8th Cir. 2010).  Defendants note that one of the two letters received from Plaintiff and reviewed by Defendant Griffin was addressed to Director Larry Crawford, and Defendants claim that these letters relate back to the allegations against Crawford in the previous lawsuit. (ECF No. 204, p. 4).  Defendants claim that Plaintiff should have brought his claims against Defendant Griffin in his previous lawsuit. (Id., p. 5).

Plaintiff asserts that his claim against Griffin is not barred by res judicata.  First, Plaintiff notes that the parties against whom the claims are made are not the same or in privity; the prior claim was made against Mr. Crawford, as the former Director of the Department of Corrections, and the present claim is against Ms. Griffin, as the Medical Contract Monitor for the Department of Corrections, for her personal actions.  (ECF No. 223, pp. 2-3).  Second, Plaintiff contends that the claims are different because they do not arise out of the "same nucleus of operative facts." Plaintiff's claim against Ms. Griffin is regarding her response to Plaintiff's letters.  Plaintiff asserts that his prior claim against Mr. Crawford does not preclude Plaintiff's claims against Ms. Griffin. (ECF No. 223, p. 3).

The Court finds that Plaintiff's claim against Ms. Griffin is not barred by res judicata because there is no privity between her and Mr. Crawford. Therefore, one of the necessary elements for issue preclusion is not present.

> 2. Qualified Immunity

Qualified immunity shields public officials "from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009)(citing Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); Stepnes v. Ritschel, 663 F.3d 952, 960 (8th Cir. 2011)). To overcome a defendant's qualified immunity claim, the plaintiff must show that: "'(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional . . . right; and (2) the right was clearly established at the time of the deprivation.'" Baribeau v. City of Minneapolis, 596 F.3d 465, 474 (8th Cir. 2010)(quoting Howard v. Kansas City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009)); Stepnes, 663 F.3d at 960. "The law is clearly established if it gives the defendant officials 'fair warning' that their conduct violated an individual's rights when the officials acted." Forrester v. Bass, 397 F.3d 1047, 1054 (8th Cir. 2005) (citing Hope, 536 U.S. at 739-40 (2002)); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) (A right is "clearly established" if "a reasonable official would understand that what he is doing violates that right."). If a state official violates a clearly established constitutional right, he is not entitled to qualified immunity. Harlow, 457 U.S. at 818-19.

Defendants Lombardi, Griffin and Bailey claim that they are entitled to qualified immunity and that Plaintiff's claims against them fail because the underlying constitutional claims against the CMS defendants fail. As previously discussed, the CMS defendants argue that they are not liable for medical indifference because of the significant amount of treatment he has received, particularly

after his complaint in August 2006. (ECF No. 204, p. 13). Likewise, Defendants contend that Plaintiff has not established a retaliation claim against Cella or Dr. Sands and, therefore, Defendants could not have tacitly authorized any violation of Plaintiff's First Amendment rights. (ECF No. 204, pp. 14-16). Accordingly, Defendants Lombardi, Griffin and Bailey contend that they could not have tacitly authorized a constitutional violation against Plaintiff.

The Court previously held that the CMS defendants, with the exception of Dr. Nagaldinne, are not liable as a matter of law to Plaintiff.[9] Likewise, Lombardi, Griffin and Bailey cannot be held liable under §1983 for tacit authorization because the underlying purported constitutional violation claims against the CMS defendants fail. See Parker v. Pool, No. 04-4135-CV-C-NKL, 2005 U.S. Dist. LEXIS 33234, at *8 (W.D. Mo. Dec. 15, 2005)("plaintiff cannot state a claim against a supervisor when the court has determined that the underlying actions by the subordinate employees were not a violation of plaintiff's constitutional rights"). The Court finds that Lombardi, Griffin and Bailey did not violate any well-established constitutional right held by Plaintiff. Because Lombardi, Griffin and Bailey did not violate any well-established constitutional right, they are entitled to qualified immunity. The Court grants summary judgment in favor of Lombardi, Griffin and Bailey on Plaintiff's §1983 tacit authorization claims.

Accordingly,

---

[9]Plaintiff's tacit authorization claims were not based upon the underlying conduct of Dr. Nagaldinne. Plaintiff never mentioned the conduct of Dr. Nagaldinne in his correspondence to Lombardi, Griffin and Bailey, and Plaintiff first wrote complaining of his treatment in August 2007-- more than a year after his visits to Dr. Nagaldinne. See Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997)(to be liable for tacit authorization, the supervisor must have "[r]eceived notice of a pattern of unconstitutional acts committed by subordinates"). Thus, the fact that the Court denies summary judgment to Dr. Nagaldinne does not preclude a grant of summary judgment in favor of Lombardi, Griffin and Bailey.

**IT IS HEREBY ORDERED** that Defendant Govindarajulu Nagaldinne, MD's Motion to Exclude the Testimony of Plaintiff's Expert Dr. Joel Nitzkin [199] and Defendants' Daubert Motion to Exclude Plaintiff's Expert Dr. Joel Nitzkin [212] are **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Report and Opinions of Dr. Richard Lehman [205] is **DENIED**, in part, and **GRANTED**, in part.

**IT IS FURTHER ORDERED** that Defendant Govindarajulu Nagaldinne, MD's Motion for Summary Judgment [200] is **DENIED**.

**IT IS FINALLY ORDERED** that Defendants George Lombardi, Melody Griffin, and Gale Bailey's Motion for Summary Judgment [203] and Defendants Corizon, Inc. f/k/a Correctional Medical Services, Inc., Dr. Michael Sands, Dr. Elizabeth Conley, Dr. Cleveland Rayford, Dr. Beverly Morrison, Dr. Laurain Hendricks, and Lois Cella's Motion for Summary Judgment [208] are **GRANTED**.

Dated this 18th day of January, 2012.

_John A. Ross_

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE